IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SHARON DENISE MORRIS,           )
        Plaintiff,           )
                                 )
        vs.                     )          Civil Action No. 05-1678
                                 )
GREAT LAKES BEHAVIORAL          )          Judge Cercone
INSTITUTE/DIVERSIFIED CARE      )          Magistrate Judge Mitchell
MANAGEMENT and ALLEGHENY        )
COUNTY DEPARTMENT OF HUMAN      )
SERVICES,                       )
        Defendants.             )

REPORT AND RECOMMENDATION

I.      Recommendation

It is respectfully recommended that the motion for summary judgment submitted on behalf of Defendant Allegheny County Department of Human Services (Docket No. 35) be granted with respect Plaintiff's Title VII claims and her disparate pay claim under the PHRA and denied in all other respects. It is further recommended that the motion for summary judgment submitted on behalf of Defendant Great Lakes Behavioral Institute/Diversified Care Management (Docket No. 37) be granted with respect Plaintiff's Title VII claims and her disparate pay claim under the PHRA and denied in all other respects.

II.     Report

Plaintiff, Sharon Denise Morris, brings this action pursuant to 42 U.S.C. §§ 2000e to 2000e-17 (Title VII), 42 U.S.C. § 1981 and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 (PHRA). She alleges that the Defendants, her former employer, Great Lakes Behavioral Institute/Diversified Care Management ("Great Lakes") and Allegheny County

Department of Human Services ("DHS") (where she worked as "purchased personnel"), discriminated against her by denying her pay raises and promotions due to her race (African American), that she was subjected to a sexually and racially hostile work environment and that Defendants retaliated against her for complaining about discrimination in the workplace.

Presently before this Court for disposition are motions for summary judgment filed by both Defendants.  For the reasons that follow, both of the motions should be granted with respect to Plaintiff's Title VII claims and her disparate pay claim under the PHRA and denied in all other respects.

Facts[1]

Plaintiff began working for Great Lakes in December 1997.  Both Great Lakes and its affiliate, Diversified Care Management, have contractual agreements with Allegheny County to place their employees as "purchased personnel" with DHS and Plaintiff was assigned to work at DHS beginning on December 4, 1997.  (Compl. ¶¶ 7-9, 37; see Docket No. 41 App. IV.)  She began her employment in the Office of Planning Information Policy Evaluation and Research and remained in this position until February 1999, when Great Lakes hired her into a newly created position of Training Manager in the Office of Behavioral Health.  (Compl. ¶ 38.)

In 2001, she took a complaint of racial discrimination, harassment and hostile work environment concerning an Allegheny County administrator, Georgianne Palaoro, to her supervisor, Gwen White (with Great Lakes) and Joanne Fascio (also with Great Lakes) and also to Marcia Hord-Lewis (the administrator for DHS who was in charge of Human Resources).  She

---

[1]These facts are taken from the complaint, as the parties have referenced them in their briefs.  Defendants have not filed statements of material facts, with appendices and citations to the record as directed in Local Rule 56.1.

also filed a complaint of hostile work environment, racial discrimination and harassment against Palaoro in 2002.  In addition, Plaintiff was listed as a witness in allegations of discrimination by two other African American co-workers who worked on the same unit.  (Compl. ¶¶ 10-12.)  In 2003, she complained in writing to Joanne Fascio and to Patricia Valentine (representing DHS) that Gwen White acted on false accusations, hearsay, gossip and other unsubstantiated information by white staff in her supervision of the department.  (Compl. ¶ 17.)

Examples of harassment against Plaintiff included: racial comments by white employees and supervisors, racist documents or materials distributed in the workplace, devaluation and personal attacks.  (Compl. ¶ 34.)  She was also the subject of unwelcome sexual jokes made by white male staff and a supervisor, Gwen White.  (Compl. ¶ 34.)[2]  She was given unjustified written memos, facts about her were misrepresented, she was alleged to have a mental health impairment and management created a paper trail to avoid having to increase her compensation. She was also denied approval for equipment she needed to carry training materials, even though she had problems with her lower back and she made her supervisor aware of it.  (Compl. ¶ 56.)

She also alleges that she was paid less than similarly situated white employees at DHS who conducted training on similar topics.  (Compl. ¶¶ 21-24, 41.)  She alleges that white employees were given higher-end job assignments that allowed them to move ahead, while African American employees were pigeon-holed into menial, clerical and more dangerous tasks. For example, the two African American supervisors (the Family Support Coordinator and the Training/Technical Assistance Coordinator) were asked to take on three job functions, but were paid less than their white counterparts, the Operations Coordinator and the Evaluation

---

[2]The complaint contains two paragraphs numbered "34."

Coordinator.  (Compl. ¶ 26; see Docket No. 41 at 7.)

Plaintiff asked about the Operations Coordinator position but was told it would be a pay cut.  When her sister applied for the position, she was deliberately sent to the wrong building by a white Project Assistant who said that she didn't believe it was right for two people from the same family to be employed by the project.  Ms. White was made aware of the situation but no remedy was ever presented and subsequently the position received higher salary than the Plaintiff's and it has been occupied by white staff since its inception.  She also alleges that there are white family members who have worked on the same unit within DHS.  (Compl. ¶ 27.)

She complained about these issues, but no remedial action was taken.  Rather, she alleges that she was retaliated against for reporting incidents of racial harassment and wage disparities by, for example, incorporating various comments that she needed to improve in the area of getting along with peers on her performance evaluation and restricting her scope of work to reflect more clerical duties.  (Compl. ¶¶ 47, 57.)

On August 30, 2005, Plaintiff sent a letter to Jennifer Golick, Business Manager at Great Lakes, in which she stated that September 9, 2005 would be her last day of work because she was leaving on long-term disability.  She outlined previously reported actions by her supervisor, Gwen White, that had contributed to her difficulty in recovering from a complicated medical procedure, including: publicizing her personal and medical problems, causing emotional distress by diminishing her position while increasing her workload with menial tasks, creating a hostile work environment by pitting co-workers against each other and making false accusations, stating that Jon McKain was "being paid handsomely" to take on social marketing (which had been added to her job responsibilities without additional compensation), and using deliberate actions

and manipulative tactics to humiliate, intimidate and undermine her.  (Docket No. 41 App. VI.)

Golick responded in a letter dated September 8, 2005, in which she stated that Great Lakes disagreed with Plaintiff's assertion that the work place environment contributed to her condition and that she had provided no physician documentation to support this claim, nor had she previously mentioned it.  Plaintiff responded in a letter dated September 9, 2005.  She reviewed her history of having raised complaints about a hostile environment that manifested itself in physical ailments and attached an email she sent to Joanne Fascio on March 28, 2002 complaining about Georgianne Palaoro.  (Id.)

Procedural History

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on February 5, 2005.  A notice of right-to-sue letter was issued on September 1, 2005.  Plaintiff filed this action on December 6, 2005.  The complaint alleges that Defendants discriminated against her by denying her pay raises and promotions due to her race, that she was retaliated against for raising complaints about discrimination in the workplace and that she was subjected to a sexually and racially hostile work environment in violation of Title VII, the PHRA and § 1981.

The complaint also cites the Rehabilitation Act of 1973.  (Compl. ¶ 4.)  However, the Rehabilitation Act is the exclusive avenue of redress for federal employees asserting disability discrimination in employment, 29 U.S.C. § 794(a), and Plaintiff was not a federal employee. Thus, the Rehabilitation Act is inapplicable to this case.  The complaint also alludes to discrimination on the basis of a disability.  (Compl. ¶¶ 49-51.)  Such a claim would be governed by the Americans With Disabilities Act, 42 U.S.C. §§ 12101-12117 (ADA).  However, the

complaint does not allege a claim under the ADA.  Finally, it is noted that, in her brief in response to Defendants' motions, Plaintiff states that she is "a member of several protected classes.  She is an African American female over the age of forty (40) years, with a disability who was subjected to employment discrimination from 1999-2005."  (Docket No. 41 at 4.)  Age discrimination is prohibited by the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 (ADEA).  However, the complaint does not allege a claim under the ADEA.

On July 31, 2007, motions for summary judgment were filed by DHS (Docket No. 35) and Great Lakes (Docket No. 37).

<u>Summary Judgment</u>

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  <u>Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson v. Liberty-</u>

Lobby, Inc., 477 U.S. 242, 248 (1986).

    Defendants' Motions for Summary Judgment

        In their motions for summary judgment, both Defendants contend that: 1) Plaintiff failed

to file her complaint within 90 days of the date she received her right-to-sue letter from the

EEOC; 2) many of the allegations date back more than 300 days prior to her filing her EEOC

charge and are therefore barred from consideration; and 3) she cannot state a claim of disparate

pay and failure to promote with mere bare allegations or mere statistics.  In addition, DHS argues

that she cannot sue DHS or Allegheny County because she did not name either entity in her

EEOC charge and DHS was not her "employer," her PHRA claims are barred for the same

reasons as her Title VII claims, and her § 1981 claims are barred because there is no evidence of

a contractual relationship between her and DHS and because 42 U.S.C. § 1983 is the exclusive

remedy for claims asserted against a municipality and she cannot utilize that statute because it is

not a "person."  Great Lakes also argues that Plaintiff cannot maintain a claim of hostile work

environment because she has not pointed to "severe or pervasive" harassment.

        Plaintiff responds that: 1) the 90-day period should be equitably tolled because she did

not receive the right-to-sue letter until a week later when it was sent first to 515 S. Trenton

Avenue (her address) and then to 430 N. Negley Avenue (her mother's address, where Plaintiff

was staying); 2) this is a continuing action involving a hostile work environment that she began

complaining about in 2001; and 3) she has identified specific individuals who were paid more

than she was.  She also argues that she did name DHS in the body of the form, that DHS

contracts with Great Lakes to "purchase personnel" and that she has pointed to evidence of

severe and pervasive harassment in the form of racist email from co-workers and other unwanted

offensive email including pornographic spam.

Great Lakes has filed a reply brief, in which it contends that Plaintiff's attempt to avail herself of equitable tolling with respect to the 90-day filing requirement is unavailing. Great Lakes argues that the fact that Plaintiff's neighbor was collecting her mail for her with her permission does not present "extraordinary circumstances" warranting tolling of the limitations period.

Filing Complaint Within 90 Days of Right-to-Sue Letter

Under Title VII, a charge of discrimination in employment must be filed with the EEOC within 180 days of the occurrence of the alleged unlawful employment practice. This period is extended to 300 days if the complainant also initiates a complaint with a parallel state agency, as occurred in this case. The EEOC must serve notice of the charge on the employer within ten days. 42 U.S.C. §2000e-5(e)(1).

The EEOC is then required to investigate the charge and the complainant must allow at least 180 days for the investigation to proceed. If, after 180 days, the EEOC has not resolved the charge, it must notify the complainant, generally through the issuance of a "right-to-sue letter," in which it states that it sees no reason to take further action. 42 U.S.C. § 2000e-5(f)(1). After 180 days, the complainant on her own may also request a right-to-sue letter, which the EEOC must issue promptly. 29 C.F.R. § 1601.28(a)(1).

Although nothing in the statute or regulations requires a party to request a right-to-sue letter or to bring a private action, if she chooses to do so, she must file it within 90 days of the date on which she has notice of the EEOC's decision not to pursue the administrative charge any further. Specifically, the statute provides that:

> If a charge filed with the Commission ... is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference ... whichever is later, the Commission has not filed a civil action under this section ... or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission ... shall so notify the person aggrieved **and within ninety days after the giving of such notice a civil action may be brought** against the respondent named in the charge (A) by the person claiming to be aggrieved....

42 U.S.C. § 2000e-5(f)(1) (emphasis added).

"The on-set of the 90-day period is generally considered to be the date on which the complainant receives the right-to-sue letter." Burgh v. Borough Council of Borough of Montrose, 251 F.3d 465, 470 (3d Cir. 2001) (citations omitted). Contrary to Great Lakes' argument, the 90-day filing period is not a jurisdictional requirement.[3] Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982). Rather, it is treated as a statute of limitations. Figueroa v. Buccaneer Hotel, Inc., 188 F.3d 172, 176 (3d Cir. 1999). The Court of Appeals for the Third Circuit has held that raising this issue is an affirmative defense and that the burden of proof "rests solely on the employer." Ebbert v. DaimlerChrysler Corp., 319 F.3d 103, 108 (3d Cir. 2003) (citation omitted). "Proof of the expiration of the statute of limitations requires proof of the lawful start of the limitations period." Id. Thus, in Ebbert, when the employer asserted that the plaintiff had received oral notice that the EEOC had decided to end its investigation and that she had 90 days in which to bring suit, it had the burden of demonstrating these facts, but the evidence it presented was insufficient to meet its burden. Id. at 116-17.

The regulations provide that: 1) a charge of discrimination should contain the full name,

---

[3]Great Lakes cites Aljadir v. University of Pennsylvania, 547 F. Supp. 667, 668-69 (E.D. Pa. 1982), which stated that all courts of appeals have held the 90-day filing requirement to be jurisdictional, despite the fact that the Supreme Court had held to the contrary seven months earlier in Zipes.

address and telephone number of the person making the charge, 29 C.F.R. § 1601.12(a)(1); 2) the

person claiming to be aggrieved has the responsibility to provide the EEOC with notice of any

change of address and notice of any prolonged absence from that current address so that she can

be located when necessary during the investigation, 29 C.F.R. § 1601.7(b); and 3) the EEOC

shall send the person claiming to be aggrieved notice of her right to sue, 29 C.F.R. § 1601.28.

      The Court of Appeals for the Third Circuit has stated that:

> When the actual date of receipt is known, that date controls.  However, in
> the absence of other evidence, courts will presume that a plaintiff received her
> right-to-sue letter three days after the EEOC mailed it.  See Fed.R.Civ.P. Rule
> 6(e); Mosel [v. Hill's Dept. Store, Inc.], 789 F.2d [251], 253 n.2 [(3d Cir. 1986)]
> (stating that the Supreme Court has suggested that Rule 6(e) applies when parties
> dispute the date of receipt).  Rule 6(e)'s three-day presumption attempts to ensure
> that the plaintiff has the benefit of the full ninety-day period when the date of
> actual receipt is unknown.

Seitzinger v. Reading Hosp. & Med. Ctr., 165 F.3d 236, 239 (3d Cir. 1999) (other citations

omitted).  In Seitzinger, the plaintiff did not recall the date she received the right-to-sue letter and

she offered only one piece of evidence to rebut the Rule 6(e) presumption that she received it on

June 18, 1995 (three days after it was mailed): the defendant received its copy on June 19, 1995.

The court did not decide whether this evidence was sufficient because, even if she had received

the right-to-sue letter on June 19, her complaint was still untimely filed.  Id.

      In Payan v. Aramark Management Services Limited Partnership, 495 F.3d 1119 (9th Cir.

2007), the plaintiff did not dispute that she had received a right-to-sue letter, but stated that the

actual date she received the letter was unknown.  The court proceeded as follows: 1) it employed

a presumption to approximate receipt, placing the burden on the defendant but allowing it to

meet its burden with circumstantial evidence; 2) it applied a presumption that the letter issuance

date was also the date on which the letter was mailed; 3) it applied a presumption that the letter

was received three days after its issuance date; and 4) it allowed the plaintiff the opportunity to

rebut the presumption that she received the right-to-sue letter three days after it was issued and

presumed mailed.  However, the court concluded that Payan failed to meet her burden to rebut

the presumption with her generalized comments about mail being sometimes delayed,

unsupported conjectures as to why the EEOC might not have mailed the letter until after the date

it was signed and proffer to produce a witness who would testify that the delivery of mail is not

always within three days and who would show mail that was delivered one month after being

sent out.  Id. at 1126-27.

Defendants argue that, applying these presumptions yields the following results: 1) the

right-to-sue letter was presumptively mailed on the date it was signed, namely September 1,

2005; 2) Plaintiff presumptively received it three days later, or on September 4, 2005; and 3) she

has not met her burden of overcoming these presumptions with the arguments in her brief or the

affidavit of her neighbor.

Defendants are correct about the first presumption (that the letter was mailed on

September 1, 2005), but not about the second one.  The Court cannot presume that Plaintiff

received the right-to-sue letter on September 4, 2005, because this was a Sunday.  See

Fed.R.Civ.P. 6(a).  Nor could she have received it on Monday, September 5, 2005, which was

Labor Day.  Id.  Rather, her presumptive date of receipt would be Tuesday, September 6, 2005.

See Brown v. Good Samaritan Hosp., 2006 WL 4725714, at *2 (C.D. Cal. Mar. 24, 2006) (when

letter was sent on September 23, 2004, plaintiff presumptively received it on Monday, September

27, 2004); Blackburn v. Eli Lilly & Co., 1999 WL 1125048, at *3 (N.D.N.Y. Dec. 1, 1999)

(taking judicial notice of the fact that December 6, 1998 was a Sunday and therefore plaintiff

presumptively received the letter on Monday, December 7, 1998); <u>Griffin v. Acacia Life Ins. Co.</u>, 151 F. Supp. 2d 78, 80 n.2 (D.D.C. 2001) (when letter was mailed on August 7, 1997, plaintiff presumptively received it on Monday, August 11, 1997).

Ninety days after September 6, 2005 was Monday, December 5, 2005.  Her complaint, which was filed on December 6, 2005, was thus not timely because 91 days had elapsed since her presumed date of receipt.  In addition, it is noted that Plaintiff stated in her complaint that she received the right-to-sue letter on September 6, 2005.  (Compl. ¶¶ 6, 48.)  The complaint is a document of record in this case to which this Court can refer and she has not even attempted to explain why she is now asserting that she received the letter "approximately one week later."

Thus, her date of receipt was September 6, 2005 and her complaint, filed on December 6, 2005, was untimely.  "We have held that a claim filed even one day beyond this ninety day window is untimely and may be dismissed absent an equitable reason for disregarding this statutory requirement."  <u>Figueroa</u>, 188 F.3d at 176 (citing <u>Mosel</u>, 789 F.2d at 253).

Plaintiff argues that:

the record also shows that the letter was mailed to [her] at her home address at 515 S. Trenton Avenue, yet a copy of the initial EEOC complaint was mailed to 430 N. Negley Avenue, Pittsburgh, PA where her mother, (for whom the Plaintiff had been caring at that address), was expected to return.  Because the mail was sent first to 515 S. Trenton Avenue, and then to 430 N. Negley Avenue, and the Labor Day holiday followed, Ms. Morris received the mail approximately a week later.  The time of receipt can be proven, as the neighbor at the adjoining duplex of 517 S. Trenton often receives the Plaintiff's mail, either by mistake or by request/courtesy.

(Docket No. 41 at 8.)  She has also submitted the affidavit of her neighbor, Elizabeth Roach, who states that she:

resid[es] at 517 S. Trenton Avenue Pittsburgh, PA 15221 ... ; that I receive mail for Sharon Denise Morris frequently by courtesy or mistake with Ms. Morris's

12

permission.  In September 2005, I was receiving mail for Ms. Morris who had mail going to her mother's home at 430 N. Negley Avenue, Pittsburgh, PA.

(Docket No. 41 App. III.)

It is not entirely clear what Plaintiff is suggesting.  She may be proposing a factual scenario in which the letter first arrived at her home address, 515 South Trenton Avenue, and then her neighbor forwarded it to her at her mother's address (or held it for her until she collected it at some later date).  Or she may be suggesting that the letter was delivered to Ms. Roach at her address, 517 South Trenton, by mistake and then she forwarded it to Plaintiff (or held it for her until she collected it at a later date).  Ms. Roach does not clarify what occurred specifically with Plaintiff's right-to-sue letter, only that she "was receiving mail for Ms. Morris" generally, although she also notes that Plaintiff had mail going to her mother's house.  Contrary to Plaintiff's argument, Ms. Roach's affidavit does not "prove" her date of receipt.  As the court observed in Payan, this kind of evidence is insufficient to rebut the presumption of receipt three days after mailing.

What is undisputed from the record is that the EEOC sent the letter to Plaintiff at "515 South Trenton Avenue, Pittsburgh, PA 15221."  (Docket No. 36 App. A at 1.)  A number of courts have held that the filing period begins when delivery of the right-to-sue notice is attempted at the "address of record with the EEOC."  See Nelmida v. Shelly Eurocars, Inc., 112 F.3d 380, 384 (9th Cir. 1997); Hill v. John Chezik Imports, 869 F.2d 1122, 1124 (8th Cir. 1989); Espinoza v. Missouri Pac. R.R. Co., 754 F.2d 1247, 1249 (5th Cir. 1985).

Plaintiff's assertion that she received the letter at the Negley Avenue address, where she was staying to care for her mother, approximately a week after it was mailed might be sufficient to rebut the presumption created by Rule 6(e) if she had requested that the letter be sent to her at

13

this address but the EEOC failed to do so.  See Ryczek v. Guest Servs., Inc., 877 F. Supp. 754, 758 (D.D.C. 1995) (when EEOC was informed of plaintiff's new address but failed to send mail there, failure to receive notice was due to events beyond her control).

However, Plaintiff has not asserted that she informed the EEOC that she would be staying at her mother's house and that she wanted her mail regarding her charge sent there, as she was required to do by the regulations.  Nor has she specifically argued that she asked the Post Office to forward her mail.  Moreover, even if she had done so, this action would be insufficient to fulfill her responsibilities.  See Williams v. Thomson Corp., 383 F.3d 789 (8th Cir. 2004) (plaintiff moved but failed to notify EEOC of her new address; the 90-day period began to run from the date the letter presumptively arrived at her address of record, not when it was forwarded by the Post Office to her new address).  Therefore, the EEOC acted properly in sending the notice to her address of record and the time began to run from the date the letter presumptively arrived at that address.

The Court of Appeals has stated that:

> Under equitable tolling, plaintiffs may sue after the statutory time period for filing a complaint has expired if they have been prevented from filing in a timely manner due to sufficiently inequitable circumstances.  The caselaw is instructive.  The Supreme Court has held that equitable tolling may be appropriate when a claimant received inadequate notice of her right to file suit, where a motion for appointment of counsel is pending, or where the court has misled the plaintiff into believing that she had done everything required of her.  See Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 151, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984).  In United States v. Midgley, 142 F.3d 174 (3d Cir. 1998), we expressed a willingness to invoke equitable tolling in a number of other circumstances: when the defendant has actively misled the plaintiff; when the plaintiff "in some extraordinary way" was prevented from asserting her rights; or when the plaintiff timely asserted her rights in the wrong forum.  See id. at 179; Oshiver [v. Levin, Fishbein, Sedran & Berman], 38 F.3d [1380,] 1387 [(3d Cir. 1994)].  See also Miller v. New Jersey State Dep't of Corrections, 145 F.3d 616, 618 (3d Cir. 1998) (equitable tolling is an appropriate remedy when principles of

14

equity would make a rigid application of the statute of limitations unfair);
Shendock v. Office of Workers' Compensation Programs, 893 F.2d 1458, 1462
(3d Cir. 1990) (same).

Seitzinger, 165 F.3d at 240 (other citations omitted).

A plaintiff who seeks to invoke equitable tolling must take action, however: "One who

fails to act diligently cannot invoke equitable principles to excuse that lack of diligence."

Baldwin County, 466 U.S. at 151.  Mere excusable neglect is not sufficient.  See Irwin v.

Department of Veterans Affairs, 498 U.S. 89, 96 (1990).

A number of courts have found that a plaintiff's failure to take action during the 90-day

period precludes her from invoking the doctrine of equitable tolling.  See Nelmida, 112 F.3d at

385 (when plaintiff had more than ten weeks after receiving the right-to-sue letter but took no

action, she could not avail herself of equitable tolling); Harvey v. City of New Bern Police Dep't,

813 F.2d 652, 654 (4th Cir. 1987) (when plaintiff knew of the right-to-sue letter within six days

of its arrival, he had 84 days in which to bring suit and he failed to show why this was not

enough time).  See also Million v. Frank, 47 F.3d 385, 389 (10th Cir. 1995) (when plaintiff's

wife received the letter but he did not look at it until six days later, he still had 24 days in which

to file suit pursuant to the 30-day filing requirement then applicable to federal employees, 42

U.S.C. § 2000e-16(c), and he was not entitled to equitable tolling).

In Seitzinger, the plaintiff repeatedly asked her lawyer to make sure that he timely filed

the complaint, but the lawyer affirmatively lied to her when he assured her that he had filed it,

when in fact he had not.  The court found this misbehavior on the attorney's part, combined with

the diligence on Seitzinger's part, sufficient to toll the statute of limitations.  165 F.3d at 241-42.

Here, however, Plaintiff has not argued, much less demonstrated, that she acted

15

diligently.  If she had received the right-to-sue letter "approximately a week" after it was mailed (that is, by September 8, 2005), she still would have had 88 days in which to file her complaint in a timely fashion.  Yet she did not do so.  Therefore, she has not demonstrated that equitable tolling should apply.  Because the complaint was not filed within 90 days of Plaintiff's receipt of the right-to-sue letter, she cannot maintain her Title VII claims in this suit.  Therefore, with respect to Plaintiff's Title VII claims, Defendants' motions for summary judgment should be granted.

To the extent that Plaintiff intends to allege discrimination on the basis of a real or perceived disability, such a claim would be governed by the ADA.  As noted above, the complaint does not contain an ADA claim.  Such a defect could be cured by amendment.  However, amendment of the complaint would be futile because the ADA incorporates the procedural requirements of Title VII, 42 U.S.C. § 12117(a), and thus her complaint would also be untimely with respect to any claims asserted under the ADA.  Therefore, any ADA claims that Plaintiff might be pursuing should be dismissed.  The same would be true with respect to any age discrimination claims under the ADEA: they are not alleged in the complaint and amendment would be futile because the ADEA also requires that a complaint be filed within 90 days of receipt of a right-to-sue letter.  29 U.S.C. § 626(e).

PHRA Claims

Like Title VII, the PHRA requires a plaintiff to exhaust administrative remedies prior to bringing a civil action in court.  43 P.S. § 962(c).  However, unlike Title VII, the PHRA does not limit the time, after receipt of the notice from the Pennsylvania Human Relations Commission (PHRC)–the state agency responsible for investigating claims of employment discrimination–

16

that it was unable to resolve the administrative charge within which a civil action must be brought. Rather, the statute requires only that any civil action must be brought within two years after notice from the PHRC that it is closing the complaint. 43 P.S. § 962(c)(2). Burgh, 251 F.3d at 471. Thus, even if the September 1, 2005 letter from the EEOC is the equivalent of notice from the PHRC that it was closing the complaint,[4] Plaintiff's December 6, 2005 complaint raising PHRA claims was timely filed.

With respect to Plaintiff's claims under § 1981, the Supreme Court has held that all claims made possible by the 1991 amendments to the act (that is, those based on acts occurring after the formation of a contract, such as a hostile work environment or disparity in pay)[5] would be subject to 28 U.S.C. § 1658(a), which created a four-year statute of limitations. Jones v. R.R. Donnelly & Sons Co., 541 U.S. 369 (2004). Even if her complaints of disparity in pay and hostile work environment date back to 2002, her claims, filed in 2005, would be timely.

However, Defendants also argue that Plaintiff's claims were not brought to the administrative agencies in a timely fashion. Under the PHRA, a complaint of discrimination must be filed with the PHRC within 180 days of the alleged act. 43 P.S. § 959(h). The Pennsylvania courts have strictly interpreted this requirement. See Vincent v. Fuller Co., 616 A.2d 969, 974 (Pa. 1992). Defendants note that Plaintiff began complaining about her pay disparity in October 2002 (Compl. ¶¶ 42, 54) and that she began complaining about a hostile work environment in 2002 (Compl. ¶ 18).

_____

[4]It would appear that the letter meets this standard because it states that the EEOC was "terminating its processing of this charge."

[5]See 42 U.S.C. § 1981(b), quoted below.

17

Plaintiff filed her charge of discrimination on February 5, 2005.[6]  This means that her complaint could refer to any acts that occurred on or after August 9, 2004, which was 180 days before she filed her charge.  As Defendants observe, Plaintiff first complained of unequal pay in 2002.

Plaintiff notes that she checked the box on her EEOC charge indicating that this was a "continuing action" that began as early as January 1, 2001.  Thus, she argues that all of her claims are timely based on the "continuing violations doctrine."

Some courts had applied this doctrine to allow a plaintiff to include discrete acts of discrimination within a charge if they were related to acts that were timely.  The Supreme Court has rejected this approach:

> discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act.  The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred.  The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.  Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).

On the other hand, when an employee raises a claim of a hostile work environment, the "unlawful employment practice" cannot be said to occur on any particular day.  Therefore, "the employer may be liable for all acts that are part of this single claim.  In order for the charge to be

---

[6]The complaint alleges that Plaintiff filed her charge on November 19, 2004.  (Compl. ¶ 48.)  Plaintiff's brief states that she "filed a Continuing Action with the EEOC and PHRC in December 2004."  (Docket No. 41 at 9.)  However, the actual charge of discrimination is dated February 5, 2005.  (Docket No. 36 App. A.)

timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." Id. at 118.

Plaintiff has not pointed to a pay disparity claim that occurred on or after August 9, 2004. Rather, her specific examples include an instance in which Gwen White requested that Sheila Bell, a white and less senior coordinator, received additional compensation because of increased job responsibilities, which occurred in January 2003. (Docket No. 41 App II.)  Therefore, her pay disparity claims under the PHRA are barred by the statute of limitations.  See Ledbetter v. Goodyear Tire & Rubber Co., 127 S.Ct. 2162 (2007).  However, her hostile work environment claim alleges numerous acts occurring after August 9, 2004 as part of a practice that began prior to that date and therefore this claim is timely brought.

Failure to Name DHS in EEOC Charge

DHS argues that Plaintiff cannot sue it because she did not name DHS or Allegheny County as a "respondent" in her EEOC charge.  As Plaintiff notes, however, the form directed her to list any respondents beyond two in the "particulars" section, she listed Great Lakes and Diversified Care Management as the respondents and explained in the particulars section, among other things, that "[a]fter my initial complaint, a determination was made by Allegheny County's HR Department that concluded that although my complaints were founded, there was 'evidence of harassment across the board.'" (Docket No. 36 App. A.)

A PHRA action ordinarily may be brought only against a party named in a PHRC charge. 43 P.S. § 959(a).[7]  However, DHS cites no authority to support its position that the party must be

_____

[7]Although the PHRA does not impose Title VII's requirement that a civil action be brought only "against the respondent named in the complaint," 42 U.S.C. § 2000e-5(f)(1), courts
(continued...)

19

named on a specific portion of the form.  To the contrary, courts have held that "[a] plaintiff may commence suit 'against defendants named in the body but not the caption of the administrative charge; such defendants have received every indication that their conduct was being formally reviewed.'" Gokay v. Pennridge Sch. Dist., 2003 WL 21250656, at *4 (E.D. Pa. Feb. 28, 2003) (quoting Diep v. Southwark Metal Mfg. Co., 2001 WL 283146, at *3 (E.D. Pa. Mar. 20, 2002)). See also Glickstein, 1997 WL 660636 at *11 (applying jurisdictional requirement of EEOC to PHRA).  DHS was named in the body of the charge.  Therefore, this argument is unavailing.

DHS also argues that it cannot be held liable because it was not Plaintiff's "employer." Plaintiff responds that she was assigned to work at DHS as "purchased personnel" under a contractual agreement that Great Lakes had with DHS and that DHS had control over various aspects of her employment.

DHS argues that, because Title VII does not define the terms "employer" and "employee," "the Court should apply the common law definition" and that Plaintiff has failed to adduce fact sufficient to allow the Court to determine whether a reasonable jury could conclude that DHS was an employer within the meaning of the statute.  (Docket No. 36 at 5.)  However, the issue is more complex than DHS articulates.  In Walker v. Correctional Medical Systems, 886 F. Supp. 515, 520 (W.D. Pa. 1995), Judge Ambrose held that, in determining whether a nurse, who was employed by Correctional Medical Systems (CMS) but who was assigned to work at the Allegheny County Jail, could sue both CMS and the County for retaliation under Title VII, the court would apply the test set by the Supreme Court in Nationwide Mut. Insurance

---

[7](...continued)
have interpreted the PHRA consistently with this procedural requirement of Title VII.  See Glickstein v. Neshaminy School Dist., 1997 WL 660636, at *10 (E.D. Pa. Oct. 22, 1997).

Co. v. Darden, 503 U.S. 318 (1992), which requires the court to apply a thirteen-factor common

law agency test when Congress has not defined the terms "employer" or "employee" in a statute.

Judge Ambrose concluded that, although many of the Darden factors weighed against the

conclusion that Walker was an employee of the County (CMS hired her, paid her, provided her

benefits, supervised her, reviewed her work, set her work schedule, and her work was not the

regular business of the County Jail), other factors supported the conclusion that Walker was a

County employee: she reported to work at the County Jail, received some supplies and equipment

from the County, and, most importantly, the warden of the jail had some control over her

conditions of employment.  Judge Ambrose concluded that "differing inferences could

legitimately be drawn as to whether Walker was an employee of the County, and therefore the

determination is properly a matter for the factfinder to resolve."  Id. at 521.

In this case, DHS has not identified which if any of the factors might apply and Plaintiff

has pointed to evidence from which inferences could be drawn that she was a DHS employee.

For example, she contends that she was retaliated against by DHS and Great Lakes in that she

was subjected to further incidents of sexual and racial harassment after she complained about this

behavior.  (Docket No. 41 at 5.)  She argues that:

> Allegheny County had control over the work environment, the Allegheny County
> employees about whom the plaintiff had complained of racial discrimination and
> harassment, and the Allegheny County computers, its systems, software and
> Internet use.  The plaintiff complained of a barrage of pornographic and offensive
> e-mails, which she received during her employment at the Allegheny County
> worksite.  The plaintiff complained that these e-mails were creating a hostile work
> environment in addition to other complaints against specific employees.  Some of
> the e-mails were racist and so graphic that the plaintiff specifically sent copies to
> both Allegheny County and Great Lakes/DCM to ask if they could do something
> to stop them with filters.  In 2005, the plaintiff continually complained to both
> Allegheny County and to Great Lakes/DCM about these e-mails, which came to
> her on a daily, and sometimes hourly basis, and froze her computer, interfering

> with her ability to do her work.  The Plaintiff logged several months (March-July
> 2005) of these e-mails, which the plaintiff had been told by the Allegheny County
> Informations administrator to put in the "Bad/Offensive e-mail" box on Allegheny
> County's system.

(Docket No. 41 at 12) (footnote omitted).  Also, in a letter to her regarding a complaint of

discrimination she made on March 28, 2002, Great Lakes stated that "we agreed that the potential

issues identified were under the control of the County DHS program and therefore the complaint

was referred to them for review."  (Docket No. 41 App. VI.)

In addition, it is possible that DHS may be liable as Plaintiff's joint employer with Great

Lakes.  The Court of Appeals has developed a test under the National Labor Relations Act,

NLRB v. Browning-Ferris Indus., 691 F.2d 1117 (3d Cir. 1982), and has applied it to

employment discrimination cases under Title VII.  In Browning-Ferris, the court held that "where

two or more employers exert significant control over the same employees–where from the

evidence it can be shown that they share or co-determine those matters governing essential terms

and conditions of employment–they constitute 'joint employers' within the meaning of the

NLRA."  Id. at 1124.

In Graves v. Lowery, 117 F.3d 723 (3d Cir. 1997), court clerks who worked for a district

justice who allegedly harassed them brought suit under Title VII against the Pennsylvania

Supreme Court, which was technically their employer under the Unified Judicial System of

Pennsylvania, and also against Dauphin County as a co-employer or joint employer.  The court

noted that "the proper inquiry under Title VII for determining employer status looks to the nature

of the relationship regardless of whether that party may or may not be technically described as an

'employer.'" Id. at 728 (citation omitted).  Again, DHS has not referred to the nature of the

relationship and Plaintiff has presented evidence that DHS shared or co-determined matters

governing essential terms and conditions of her employment along with Great Lakes.

Finally, it is noted that the PHRA contains an additional provision not found in Title VII. The PHRA states that it is an unlawful employment practice:

> For any person, employer, employment agency, labor organization or employe, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice.

43 P.S. § 955(e).  Thus, even if DHS does not satisfy either of the tests applied to determine employer status under Title VII, it could still be liable under the PHRA for aiding and abetting discrimination.  See Dici v. Commonwealth of Pa., 91 F.3d 542, 553 (3d Cir. 1996).  Therefore, this argument is unavailing.

<u>Asserting Claims under § 1981 against DHS</u>

DHS argues that Plaintiff cannot state a claim against it under § 1981 because she had no contractual relationship with it.  It further contends that she cannot sue it under § 1981 because it is a municipal agency and that her exclusive remedy is 42 U.S.C. § 1983, and that she could not maintain a claim against it under § 1983 because it is not a "person."

Section 1981 provides as follows:

(a) Statement of equal rights

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981.

DHS offers no support for its argument that Plaintiff cannot maintain a claim against it under § 1981 because her contract of employment was with Great Lakes.  Courts have held that anyone who impairs someone's contractual relationship (whether or not the offending party is part of the contractual relationship) can be held liable under § 1981.  See generally Pryor v. National Collegiate Athletic Ass'n, 288 F.3d 548, 570 (3d Cir. 2002) (approvingly citing authority that at-will employees, who can be fired for no reason at all, can still maintain a claim under § 1981 if they are fired for a discriminatory reason); Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 14 (1st Cir. 1999) (independent contractor could sue under § 1981 for hostile work environment).

DHS's other argument–that Plaintiff cannot maintain suit against it because it is a municipal authority–presents a more complex issue.  In Jett v. Dallas Independent School District, 491 U.S. 701 (1989), an athletic director and head coach brought civil rights claims under 42 U.S.C. §§ 1981 and 1983 against a school principal and the school district.  His § 1981 claim was based on the allegation that his removal from the athletic director and head coaching positions was motivated by the fact that he was white, and that the principal (who was black), and through him the school district, were responsible for the racially discriminatory diminution in his employment status.  However, after reviewing the legislative history of the civil rights claims, the Supreme Court held that "Congress intended that the explicit remedial provisions of § 1983 be controlling in the context of damages actions brought against state actors alleging

24

violation of the rights declared in § 1981." Id. at 731.  Thus, the effect of the Jett case was that,

plaintiffs attempting to allege violations of § 1981 by municipalities were required to restate their

claims under § 1983, including that statute's requirement that the plaintiff allege an official policy

or custom, because liability cannot be alleged on the theory of respondeat superior.  Monell v.

New York City Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).

The Civil Rights Act of 1991 amended § 1981 by adding the following subsection: "The

rights protected by this section are protected against impairment by nongovernmental

discrimination and impairment under color of State law."  42 U.S.C. § 1981(c) (1991).  Federal

courts have split with respect to the question of whether the 1991 amendments abrogate either of

the two holdings in Jett: 1) that § 1981 does not provide a cause of action against local

governmental agencies and that an action must be brought under § 1983; and 2) that a plaintiff

may not rely upon respondeat superior liability but must meet the policy or custom requirement

of § 1983.

The Court of Appeals for the Ninth Circuit held that § 1981(c) overruled Jett and

provided a cause of action against local governments, but the plaintiff must still meet the policy

or custom requirement of § 1983.  Federation of African American Contractors v. City of

Oakland, 96 F.3d 1204, 1209 (9th Cir. 1996).  However, four other circuits have held that

§ 1981(c) overruled neither of Jett's two holdings.  See Bolden v. City of Topeka, Kan., 441 F.3d

1129, 1137 (10th Cir. 2006); Oden v. Oktibbeha County, Miss., 246 F.3d 458, 463-64 (5th Cir.

2001); Butts v. County of Volusia, 222 F.3d 891, 894 (11th Cir. 2000); Dennis v. County of

Fairfax, 55 F.3d 151, 156 n.1 (4th Cir. 1995).

The Court of Appeals for the Third Circuit has referred to this issue as "an open question

25

in this circuit." Cardenas v. Massey, 269 F.3d 251, 268 (3d Cir. 2001).  However, as at least one

district court has observed, the court "continued to analyze whether two state actors named in the

suit could be held liable under Section 1981, signaling that, in the Third Circuit, relief is

available under Section 1981." Riley v. Delaware River & Bay Auth., 457 F. Supp. 2d 505, 512

(D. Del. 2006).

 DHS has not discussed any authority postdating Jett.  Therefore, it has not demonstrated

that, under the current state of the law, Plaintiff's § 1981 claim against it should be precluded.

 Disparate Pay Claim

 Plaintiff alleges that she received pay unequal to that received by white, less senior and

male counterparts, in violation of § 1981.[8]  Defendants argue that she has not supported her

claims with a minimum of evidence but relies on the allegations of her complaint and generalized

statistics.

 Plaintiff contends that African Americans were paid significantly less than whites holding

coordinator positions, that she possessed similar education and several years more experience

than her white and less senior co-workers, and that Gwen White requested that Sheila Bell, a

white and less senior coordinator, receive additional compensation because of increased job

responsibilities.  (Docket No. 41 App II.)  Defendants have not responded to this evidence.

Plaintiff has pointed to sufficient evidence to support her claim.

 Sexually/Racially Hostile Work Environment

 Plaintiff alleges that she was subjected to a sexually and racially hostile work

---

 [8]For the reasons explained above, her Title VII and PHRA claims arising relating to this
issue should be dismissed for procedural reasons.

environment.  For the reasons stated above, to the extent these claim are asserted under Title VII, they should be dismissed.  However, the § 1981 and PHRA claims remain and are analyzed under the same substantive standards as claims under Title VII.  See Weston v. Commonwealth of Pa., 251 F.3d 420, 425 & n.3 (3d Cir. 2001) (sexually hostile work environment under PHRA); West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995) (racially hostile work environment under PHRA); Manatt v. Bank of America, 339 F.3d 792, 797 (9th Cir. 2003) (hostile work environment under § 1981).  Of course, § 1981, which prohibits racial discrimination, does not apply to sex-based discrimination claims.  Anjelino v. New York Times Co., 200 F.3d 73, 98 (3d Cir. 1999).

The Supreme Court has held that a plaintiff may establish a Title VII violation if she can show that discrimination based on sex created a hostile or abusive working environment. Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998).  The Court of Appeals has held that:

> Five constituents must converge to bring a successful claim for a sexually hostile work environment under Title VII:(1) the employee suffered intentional discrimination because of their sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of respondeat superior liability.

Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)).  The same standards apply to a racially hostile work environment.  See Faragher, 524 U.S. at 786-87 & n.1; Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996) .

Great Lakes argues that Plaintiff has not adduced evidence that the discrimination was "severe or pervasive."  It points to the following: 1) she stated that an email was delivered to her regarding Jim Crow laws, but she could not recall the contents of the email, and after she

27

reported it to her supervisor she received no further emails of this sort (Morris Dep. at 13);[9] 2) shortly after September 11th, Georgianne Palaoro, a DHS administrator, made the statement that "the place was getting too damned liberal" but the comment was not directed at Plaintiff (Morris Dep. at 17-18); 3) Ms. Palaoro expressed a general dislike for "cultural competence" programs, but when Plaintiff reported to Great Lakes that Ms. Palaoro had offended her, Great Lakes took action to remedy the problem by conducting an investigation and communicating with DHS regarding the problem and Plaintiff was removed from Ms. Palaoro's supervision chain (Morris Dep. at 23-27); 4) she complained that racial jokes were common but could not recall their content (Morris Dep. at 28, 96[10]); 5) at her deposition, she continually referred back to the allegations of the complaint (Morris Dep. at 19), but these allegations required further substantiation and clarification; and 6) she asserted that Keith Solomon, a subcontractor for Allegheny County, referred to cultural competence as a joke (Morris Dep. at 16-17), but this incident does not rise to the level of being "severe" and there is no indication that Solomon represented either DHS or Great Lakes when he made the comment.

Plaintiff responds that she:

has presented evidence of severe and pervasive harassment in the form of racist e-mail from co-workers, and other unwanted offensive e-mail including pornographic SPAM.  The plaintiff complained of a barrage of pornographic and offensive e-mails, which she received during her employment at the Allegheny County worksite.  The plaintiff complained that these e-mails were creating a hostile work environment in addition to the other complaints against specific employees.  Some of the e-mails were racist and so graphic that the plaintiff specifically sent copies complaining to Great Lakes/DCM to ask if they could do something to stop them with filters.  In 2005, the plaintiff continually complained

_____

[9]Docket No. 38 App. 1.

[10]Docket No. 38 App. 2.

to both Allegheny County and to Great Lakes/DCM about these e-mails, which
came to her on a daily and sometimes hourly basis, often freezing her computer,
interfering with her ability to do her work.  The Plaintiff logged several months
(March-July 2005) of these e-mails, which the plaintiff had been told by the
Allegheny County Informations Administrator to put in the "Bad/Offensive
e-mail" box on Allegheny County's system.  Although some of the most offensive
e-mail was SPAM, Allegheny County and Great Lakes/DCM had been put on
notice that it was creating a work environment, which was stressful and interfered
with the plaintiff's ability to work.

(Docket No. 41 at 4.)  She has attached to her brief over 40 pages of pornographic, explicit email

messages she received between March and May 2005 and which she reported to both DHS and

Great Lakes.  (Docket No. 41 App. V.)  Defendants have not responded to this evidence.

The Supreme Court has stated that: "whether an environment is 'hostile' or 'abusive' can

be determined only by looking at all the circumstances.  These may include the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work

performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

A workplace inundated with pornographic images and sexually explicit messages can

constitute a sexually hostile work environment.  Andrews, 895 F.2d at 1485-86.  The Court of

Appeals has held that "courts should not consider each incident of harassment in isolation.

Rather, a court must evaluate the sum total of abuse over time."  Durham Life Ins. Co. v. Evans,

166 F.3d 139, 155 (3d Cir. 1999) (citing Andrews, 895 F.2d at 1484).  In that case, the evidence

demonstrated that Dianne Evans, who had been an extremely successful life insurance

salesperson for Met Life for seventeen years, had been recruited to join Durham, where she was

promised her own office and secretary, as well as unlimited phone and mailing costs to be paid

for by Durham.  However, when new managers took over, they fired Evans' secretary, took over

her office and (at least on one occasion) grabbed her buttocks from behind and told her that she smelled good.  She was assigned numerous "lapsed books," policies that were no longer active because the policyholders had switched insurance companies, and because of the way commissions were calculated, her bonus was severely cut; no male agents received as many lapsed books.  In addition, Evans was subjected to derogatory comments, including the following: she "made too much money for a goddamn woman"; she was asked to go dancing "into the fields" with the acting general manager; she was threatened that if she tried to leave and take clients with her the company would "attach her house before she left the courtroom"; when she lost an account because promised legal assistance from the home office did not arrive, her supervisor said "What do you know about annuities, you're only a woman."  Finally, she was told that she was being moved to another office and then (after she had assembled all of her files for the move) she was told that she was not moving and she discovered that her files were gone. Id. at 145-46.

Durham argued that the court should not have considered all of these incidents together, because some of them were apparently triggered by sexual desire, some were sexually hostile some were non-sexual but gender-based, and some were facially neutral.  However, the Court of Appeals held that it would "treat the sexual misconduct and the gender-based mistreatment in this case as sex discrimination.  The facially neutral mistreatment plus the overt sex discrimination, both sexual and non-sexual, in sum constituted the hostile work environment." Id. at 148 (citations omitted).  See also Abramson v. William Paterson College of N.J., 260 F.3d 265, 276 (3d Cir. 2001) ("While the individual pieces of evidence alone may not suffice to make out the claims asserted, we must view the record as a whole picture.")

With respect to a racially hostile work environment, the Court of Appeals has noted that "while discriminatory conduct persists, violators have learned to leave the proverbial 'smoking gun' behind....  But regardless of the form that discrimination takes, the impermissible impact remains the same, and the law's prohibition remains unchanged.  'Title VII tolerates no racial discrimination, subtle or otherwise.'"  Aman, 85 F.3d at 1082 (quoting McDonnell Douglas v. Green, 411 U.S. 792, 801 (1973)).  In Aman, two black employees (Aman and Johnson) appealed the district court's grant of their former employer's motion for summary judgment on the basis that they had failed to demonstrate the existence of a racially hostile work environment.  They did not allege that they had been called names that were overtly racial, but instead they were referred to by what the Court of Appeals called "inherently racist remarks" such as "another one," "one of them," "that one in there," and "all of you."  The court also noted that other black employees were harassed on a daily basis by employees at Cort Furniture, who hurled insults such as "don't touch anything," and "don't steal."  The court stated that "Aman and Johnson were also subjected to apparently false accusations of favoritism, incompetence, and were made to do menial jobs.  The evidence of record shows that white employees were not treated in a similar fashion."  Id.

The court further stated that:

> In addition to those described above, Aman and Johnson testified to numerous other examples of harassment which, viewed in isolation, arguably may not have been motivated by racial animus.  For example, Aman alleges that her time cards were stolen, making it harder for her to perform her job.  Other employees physically snatched things from her.  Aman was falsely accused of wrongdoing on at least two occasions.  As discussed earlier, several employees, including a sales manager, ignored or refused to deal with Aman.  Johnson was informed on several occasions that Aman "had to go."  In addition, [general manager Robert] Kurtz yelled at Aman on a daily basis, and there is conflicting evidence as to whether he yelled at any white employees at Cort Furniture.  After

31

Aman and Johnson began complaining about racial discrimination, employees were asked to keep complaint lists about Aman.  Similarly, Kurtz withheld relevant financial information from Johnson and gave her orders that directly contradicted orders from the controller, Jim Newton, as well as company policy.  In response to one of these occasions, Newton slammed the door to Johnson's office and yelled at her.  Even though he apologized, he admitted that he had never behaved in this fashion toward anyone else.

In light of the suspicious remarks discussed above, a reasonable jury could interpret this behavior as part of a complex tapestry of discrimination when examined in conjunction with the comments made by Cort Furniture's employees and management....

... We do not imply that such acts of harassment must be accompanied by racially discriminatory statements.  Indeed, we have previously held that overt racial harassment is not necessary to establish a hostile environment.  See Andrews, 895 F.2d at 1485.  All that is required is a showing that race is a substantial factor in the harassment, and that if the plaintiff had been white she would not have been treated in the same manner.  Id.  We simply note that the harassment of black employees, when combined with the discriminatory statements made by other Cort Furniture employees, can be viewed as making the plaintiffs' racial discrimination claim all the more compelling.  This is especially true given that a reasonable jury could conclude that Cort Furniture's management was not only aware of these acts and statements, but was also a source of the harassment and comments.

Viewed in the light most favorable to the non-moving parties, Aman and Johnson not only have established a prima facie case of discrimination, but they have also provided sufficient evidence such that a reasonable jury could conclude that they were subject to intentional discrimination on a regular and pervasive basis.  We conclude, therefore, that summary judgment as to Aman and Johnson's hostile environment claim should not have been granted.

Id. at 1083-84.

Plaintiff has referred to similar examples of African American employees being subjected to "denigrating or dismissive language ...  and/or hostile boy language such as eye rolling, staring, walking away, or shaking her head (indicating 'no' or disagreement) while myself or others are speaking."  (Docket No. 41 App. VI.)  She referred to comments by Joanne Fascio including "I don't care if you see a voodoo priest" or, in response to why little was done about

32

Georgianne Palaoro's behavior, "why isn't O.J. in prison?" (Id.) She has submitted sufficient evidence of a work environment infused with sexual and racial messages to meet the "severe and pervasive" prong of a hostile work environment claim. Therefore, this argument is unavailing.

Retaliation

Plaintiff alleges that she was retaliated against for complaining about discrimination in the workplace. Discrimination against an individual who has opposed a practice prohibited by the PHRA or who has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under the act is itself actionable conduct. 43 P.S. § 955(d). The same is true with respect to § 1981. See Cardenas, 269 F.3d at 263; Foley v. University of Houston Sys., 355 F.3d 333, 339 (5th Cir. 2003).

As summarized by the Court of Appeals, following the Supreme Court's decision in Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405 (2006), the prima facie case elements of a retaliation claim are now as follows: 1) the plaintiff engaged in activity protected by the anti-discrimination statute; 2) the employer took action that a reasonable employee would have found to be materially adverse in that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination; and 3) there is a causal connection between the plaintiff's opposition to or participation in proceedings against unlawful discrimination and the employer's action. Moore v. City of Philadelphia, 461 F.3d 331, 341-42 (3d Cir. 2006). These standards apply to claims brought under the PHRA, Weston, 251 F.3d at 430, and § 1981, Cardenas, 269 F.3d at 263. In addition, Plaintiff alleges that the retaliation took the form of the Defendants "continued to allow further incidents of harassment including but not limited to: sexual joking, pornographic and racist internet SPAM, racially offensive remakes and

33

e-mail promoting stereotypes of African Americans and other ethnic minorities." (Docket No. 41 at 5.) The Court of Appeals has held that a retaliation claim can be predicated upon a hostile work environment. <u>Jensen v. Potter</u>, 435 F.3d 444, 449 (3d Cir. 2006).

Plaintiff has submitted evidence that she made numerous complaints about discrimination in the workplace and she has asserted that she suffered, in the form of a hostile working environment if not adverse employment actions, as a result. Defendants have not raised arguments with respect to her retaliation claims. Therefore, they remain in the case.

In summary, Plaintiff's Title VII claims are barred because she did not file suit within 90 days of receiving her right-to-sue letter. Her claims brought pursuant to § 1981 (disparate pay, racially hostile work environment, retaliation) and some of her claims brought under the PHRA (racially and sexually hostile work environment, retaliation) remain in the case, but her disparate pay claim is barred because she did not raise it within 180 days of its occurrence.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Defendant Allegheny County Department of Human Services (Docket No. 35) be granted with respect Plaintiff's Title VII claims and her disparate pay claim under the PHRA and denied in all other respects. It is further recommended that the motion for summary judgment submitted on behalf of Defendant Great Lakes Behavioral Institute/Diversified Care Management (Docket No. 37) be granted with respect Plaintiff's Title VII claims and her disparate pay claim under the PHRA and denied in all other respects.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely

objections may constitute a waiver of any appellate rights.

Respectfully submitted,


s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: October 24, 2007